## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| WAYNE PARKS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 20-2459-KHV |
| | ) | |
| WHEATLAND ELECTRIC | ) | |
| COOPERATIVE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Wayne Parks filed suit against Wheatland Electric Cooperative, Inc., alleging that defendant discriminated against him based on disability, failed to accommodate his disability and retaliated against him because he requested accommodations, all in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Pretrial Order (Doc. #73) filed July 29, 2021 at 8. This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #74) filed August 4, 2021. For reasons stated below, the Court overrules defendant's motion.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the

suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  <u>Nahno-Lopez</u>, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. <u>See</u> <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 250–51.  In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988); <u>Olympic Club v. Those Interested Underwriters at Lloyd's London</u>, 991 F.2d 497, 503 (9th Cir. 1993).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251–52.

**Factual Background**

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff.

In 2009, defendant hired plaintiff into its apprenticeship program.   When plaintiff successfully completed the program, defendant promoted him to journeyman lineman in Syracuse, Kansas.   On September 16, 2015, plaintiff removed his protective rubber gloves and touched an energized power line, causing severe injuries to his upper extremities.   After investigating the incident, defendant disciplined plaintiff and other employees for failure to follow safety protocols. Plaintiff's medical providers sought to save his right hand and wrist, but amputation was necessary in April of 2017.   Thereafter, plaintiff received a prosthesis and began physical therapy.

For more than three years, defendant gave plaintiff an extended leave of absence and allowed him and his family to remain on its health insurance plan.   From September 17, 2015 through January 17, 2019, pursuant to § 44-510c(b)(2)(A), plaintiff received worker's compensation benefits for temporary total disability.[1]   During this time, Kansas law prohibited defendant from requiring that plaintiff return to work, but defendant supplemented plaintiff's disability benefits to keep him at the same compensation level as if he were still working.   It also allowed plaintiff to accrue vacation time and receive payments for such time as if he were still working.

Plaintiff reached maximum medical improvement in October of 2018.   Before that time, he and his wife had many conversations with defendant's employees about his willingness and readiness to return to work.   Throughout that time, management employees such as Matthew Riley

---

[1]      Under § 44-510c(b)(2), "[t]emporary total disability exists when the employee, on account of the injury, has been rendered completely and temporarily incapable of engaging in any type of substantial and gainful employment."

(Line Foreman), Randy Coleman (District Manager), Rick Klaus (Area Operations Manager), Phillip Shelley (Director of Operations), Barbara Kirk (Manager of Human Relations), Quinten Wheeler (Manager of Safety and Compliance), James McVay (General Counsel) and Bruce Mueller (Chief Executive Officer) knew about plaintiff's injury and recovery process.

Riley, Coleman and plaintiff are friends, and Riley and Coleman monitored plaintiff's progress and recovery following the amputation.  Shelley kept up to date on plaintiff's status and recovery through Kirk and Vince Strickler, the previous Manager of Human Relations, who were in regular contact with Sherri Boyle, plaintiff's caseworker for his worker's compensation claim. Kirk was familiar with plaintiff's injury and administered defendant's benefits plan through the end of his recovery.  Kirk also provided updates to fellow managers about the status of plaintiff's injury and when he would have a Functional Capacity Examination ("FCE") to determine whether he could return to work as a journeyman lineman.  Kirk was in contact with Boyle in April, June and November of 2018 regarding plaintiff's recovery and the results of his FCE.   On August 14, 2018, McVay emailed Boyle and stated, "It is my understanding that the claimant is reaching [maximum medical improvement] and will receive permanent work restrictions in the near future."  That same day, Boyle responded that she would keep McVay up to date.  On October 24, 2018, Boyle emailed McVay the results of the FCE, which had occurred on October 23, 2018. On November 7, 2018, Kirk responded with concern that plaintiff's FCE did not address the fact that Class 2 rubber safety gloves cannot contain conductive material and that plaintiff could not perform a pole-top rescue.[2]  Shelley and Klaus updated Mueller on plaintiff's medical treatment, recovery and amputation.

---

[2]     The journeyman lineman position requires that individuals wear Class 2 rubber gloves without conductive material in the glove, and plaintiff's prosthetic was made out of

(continued . . .)

On multiple occasions in 2017 and 2018, plaintiff told Riley that he wanted to return to work "as a 'groundman only' on a crew, working in the office or work[ing] as an assistant in the safety department."[3]   In 2017 and 2018, plaintiff and his wife talked with Coleman about his progress and recovery and told him that he wanted to get back to work.[4]   Coleman responded that plaintiff needed to talk with Coleman's boss, Klaus.[5]   On February 21, 2018, plaintiff called Klaus and told him that he wanted to return to work, and Klaus told him that he needed to contact his boss, Shelley.[6]   On February 21, 2018, plaintiff called Shelley and told him that he wished to return to work.[7]   Shelley told plaintiff that he would not discuss plaintiff's return to work until plaintiff

---

[2] (. . . continued)
conductive material.   Further, the Occupational Health and Safety Act ("OSHA"), 29 CFR § 1910.269(a)(2)(i)(B), mandates that a journeyman lineman be able to climb a pole to perform certain safety procedures, such as pole-top rescue, and if plaintiff could not perform such rescues, he would not be qualified for the position.

[3]      Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 6 (Doc. #79-6 12/18/19 M. Riley Statement) filed August 25, 2021.

[4]      Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 11 (Doc. #79-11 Declaration of Leslie Parks); Ex. 12 (Doc. #79-12 Coleman Deposition).

[5]      Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 5 (Doc. #79-5 Declaration of Wayne Parks); Ex. 12 (Doc. #79-12 Coleman Deposition).

[6]      Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 5 (Doc. #79-5 Declaration of Wayne Parks).

[7]      Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 5 (Doc. #79-5 Declaration of Wayne Parks); Ex. 14 (Doc. #79-14 Shelley Deposition).

had reached maximum medical improvement.  Through the HR Department, Shelley also heard that plaintiff wanted to come back to work in one capacity or another.[8]

On April 27, 2018, Boyle emailed Kirk and told her that plaintiff's wife had informed her that plaintiff would like to return to work.[9]  On May 4, 2018, plaintiff emailed Kirk that he was "[l]ooking forward to coming back to work soon!"[10]

As noted, plaintiff reached maximum medical improvement in October of 2018 and on October 23, 2018, he had a FCE to determine whether he could perform the essential functions of his prior position as a journeyman lineman.  The essential functions of a journeyman lineman include the need to use both hands with a firm grip, the requirement to wear Class 2 rubber gloves and the ability to climb poles.  The Occupational Health and Safety Act ("OSHA"), 29 CFR § 1910.269(a)(2)(i)(B), mandates that a journeyman lineman be able to climb a pole to perform safety procedures such as pole-top rescues.  A pole-top rescue is a life-saving emergency procedure to rescue a person who has suffered an electrical contact injury or sudden illness or injury that renders him unconscious or incapacitated on top of a utility pole.  OSHA regulations and defendant's safety manual require that all employees involved in the operation and maintenance of electrical power systems, including journeyman linemen, be able to perform pole-top rescues and be tested on them annually.

---

[8]     Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 14 (Doc. #79-14 Shelley Deposition).

[9]     Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 17 (Doc.#79-17 4/27/18 Boyle email to Kirk).

[10]     Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 18 (Doc. #79-18 Parks and Kirk email threads).

Prior to plaintiff's FCE, on August 14, 2018, McVay had emailed Shelley, Mueller and Trey Grebe (Assistant General Manager) and stated, "I think that we should make a video of [pole top rescue training, regular pole climbing training and PPE deployment training]. This could actually [stave off] litigation problems in the future. If we can cut this off at the pass now, I could prevent a later suit. If I can get this to the FCE company – they will be our witness in the future. BIG POINT. THIS COULD BE CHECKMATE IN A FUTURE SUIT."

Plaintiff's FCE identified numerous areas of permanent disability, impairment and restrictions: (1) only working seven to eight hours a day and no overtime, (2) restrictions on overhead lifting, (3) no use of the right hand/extremity to perform any work activities, (4) limited use of the left hand and (5) inability to climb poles. On November 7, 2018, Dr. George Fluter performed an independent medical examination. Dr. Fluter and Dr. Richard Olson, plaintiff's primary care physician, agreed that plaintiff could not perform the essential functions of a journeyman lineman position.[11] On February 1, 2019, Dr. Olson released plaintiff to return to work with the restrictions set out above. On February 7, 2019, plaintiff's worker's compensation attorney forwarded those restrictions to McVay and stated, "I am hopeful that [plaintiff] can maintain accommodated work with Wheatland."

After plaintiff received his permanent restrictions, he sought to return to his prior job, claiming that he could perform the essential functions of a journeyman lineman. On numerous occasions, plaintiff also expressed a general desire to return to work, including in other capacities

---

[11]    Plaintiff asserts that since April of 2017, defendant's top management had known that he could not perform the essential functions of the journeyman lineman position. Plaintiff claims that Coleman, Klaus, Shelley, Wheeler and Mueller knew that he could not perform the essential functions of the position because with only one hand, he could not perform a pole-top rescue. <u>Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment</u> (Doc. #79) at 11–12.

such as office work.[12]   On February 8, 2019, McVay emailed plaintiff's worker's compensation attorney and stated, "Mr. Parks is responsible for pole top rescue and it is my understanding that he would not meet the essential functions wearing the rubber gloves that do not have an electric conductor inside the glove.  Even with these restrictions, it doesn't seem that he would be able to perform the essential functions of his job."  On February 8, 2019, plaintiff's counsel responded that he anticipated "a complete review of available positions with Wheatland and considerable effort to accommodate this injured, but ready willing and able to work citizen."

On February 12, 2019, after receiving plaintiff's final medical reports, defendant convened a meeting of Klaus, Kirk, Mueller, McVay and Grebe to review plaintiff's restrictions and decide whether reasonable accommodations were possible.   Defendant considered potential accommodations, including whether it had other positions for which plaintiff was qualified.  The group concluded that plaintiff could not perform the essential functions of the journeyman lineman position, that defendant had no reasonable job modifications that would enable him to perform the essential functions of that position and that putting plaintiff in that position would pose a serious risk to him and others.

Defendant claims that at the time of the meeting on February 12, 2019, it had three openings (Social Media Specialist, Member Services and Key Accounts Manager I positions), and that plaintiff was not qualified to perform any of them.  Plaintiff presents no evidence that he was qualified for any of these three positions, but asserts that he was qualified for consumer services representative positions which defendant posted before he reached maximum medical

---

[12]      Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment Ex. 6 (Doc. #79-6 12/18/19 M. Riley Statement).

improvement in October of 2018.[13]  On October 22, 2018, defendant posted a consumer services representative position on its web site.  Defendant filled that position on December 6, 2018.  The position of Consumer Services Representative required (1) a high school graduate degree or equivalent, (2) good typing skills and advanced knowledge of office equipment, (3) knowledge of and advanced proficiency in use of Microsoft Windows and Microsoft Office software, including Word, Excel, PDF and Outlook, (4) previous computer experience and knowledge of spreadsheet programs and other computer related software programs, (5) strong attention to detail, excellent organizational skills and the ability to maintain confidential information, (6) ability to resolve complex and sensitive member service problems through research and investigation of work papers and discussions with members, (7) ability to remain calm and professional during member contacts that can be high stress and verbally abusive, (8) excellent organizing, planning, self-development, decisiveness and written and verbal communication skills, (9) knowledge of the

---

[13]      Plaintiff notes that on July 20, 2017, defendant posted a consumer services representative position for defendant's Garden City office.  Also, on August 28, 2017, defendant posted a consumer services representative position for its Tribune office.  The record does not disclose whether defendant filled either of these positions.  Because both openings occurred while plaintiff was totally disabled, however, well before his FCE and release to return to work, they were not available to plaintiff.

Plaintiff also claims that on the day of the meeting on February 12, 2019, defendant had an opening for a staking technician.  Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #79) at 17–18.  Plaintiff cites deposition testimony of Coleman and Klaus describing Coleman's transition from Area Supervisor to District Manager and the need for an additional employee to do staking work in Tribune, Kansas, as a result of Coleman's promotion.  Id.  Plaintiff does not cite record evidence that defendant had an actual opening, only that Coleman had been performing the staking work and that he had to keep doing it after his promotion.  Defendant did not officially have an open position for a staking technician, so this position was not available to plaintiff.  Duvall v. Georgia-Pacific Consumer Products, L.P, 607 F.3d 1255, 1261 (10th Cir. 2010) (not reasonable to require employer to create new job for purpose of reassigning employee to that job).

electric cooperative programs and activities preferred, (10) ability to work overtime when needed and (11) potential overnight travel.

In support of his assertion that he qualified for the consumer services representative position, plaintiff cites his own declaration and deposition testimony of Coleman. When asked whether Coleman thought plaintiff could be a consumer services representative, Coleman responded, "I'm sure he could. Bright boy." When asked whether plaintiff could have been a good consumer services representative, Coleman responded, "Yes." Plaintiff's declaration states that in 2018 and 2019, he could perform the essential functions of the consumer services representative position: (1) he is a high school graduate with good typing skills and knowledge of office equipment used in the position, (2) he has knowledge of and advanced proficiency in Microsoft Windows, Office and spreadsheet programs, which he used at his job after the termination of his employment with defendant, (3) as a lineman, he interacted regularly with defendant's customers in the field, (4) as a lineman, he obtained extensive knowledge of the electric cooperative programs and activities, (5) he had the ability to work overtime when needed and met the physical requirements of the job description and (6) he could perform the basic duties/responsibilities listed in the job description.

Defendant asserts that plaintiff was not qualified for the consumer services representative position, citing McVay's declaration that the position "requires typing and computer skills that Mr. Parks had no work experience performing and also requires 'fine finger dexterity' that the FCE shows that he does not possess."

As noted, on October 22, 2018, defendant advertised an opening for a consumer services representative. At that time, plaintiff was reaching maximum medical improvement and hoping to return to work in some capacity in the very near future. On December 6, 2018, after defendant

received plaintiff's FCE and knew that plaintiff could not return to his prior position, defendant hired someone else for the consumer services representative position.  The record contains no evidence that defendant considered plaintiff for that job.

On February 13, 2019, McVay reported to plaintiff's attorney the conclusions from the meeting on February 12, 2019.  Plaintiff's attorney did not dispute defendant's conclusion that plaintiff could not return to his prior position, request any accommodations or mention that plaintiff was interested in any other positions.  On February 19, 2019, defendant terminated plaintiff's employment because it determined that it could not reasonably accommodate his disability.

A few months after it terminated plaintiff's employment, defendant considered the possibility of creating a new position in Tribune for a staking technician.  Defendant went through a hiring freeze until the end of 2019, after which time it approved the creation of that position.  On January 31, 2020, defendant offered plaintiff the staking technician position, which paid less than a journeyman lineman but had the same benefits.  Although he was unemployed, plaintiff never responded to this job offer.  Defendant followed up several times, but plaintiff did not respond.

Plaintiff did not accept the offer for multiple reasons.  First, defendant offered him $29.14 per hour, an annual salary of $60,611.20, which was the rate of pay for a new employee.  Second, defendant's offer was "contingent upon [him] successfully passing a pre-employment background check, a drug screening, and driver's license check," which treated plaintiff as a new hire rather than an employee with ten years of experience.  The offer included another contingency, that "[c]onsidering his current work restrictions, Wheatland will need to discuss the job description and essential functions with you."  Finally, after defendant terminated his employment, plaintiff

fell into arrears on his mortgage, so he and his family planned to move to Fair Grove, Missouri and he did not want to work in Tribune, Kansas.

In December of 2019, shortly before defendant offered plaintiff the staking technician position, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that defendant should have accommodated a return to his former job by purchasing a plastic prosthetic and leather glove and requiring that co-workers perform any pole rescues, or offered him a different position.

On September 17, 2020, plaintiff filed suit in this Court.  Plaintiff alleges that (1) defendant discriminated against him in violation of the ADA, 42 U.S.C. § 12112(a), by terminating his employment because of his disability, (2) defendant violated the ADA, 42 U.S.C. § 12112(b)(5)(A), by failing to engage in the interactive process and accommodate him by offering a different position and (3) defendant retaliated against plaintiff in violation of the ADA, 42 U.S.C. § 12203(a), by terminating his employment after he requested accommodations.  Pretrial Order (Doc. #73) at 8.

At this point, all parties agree that with or without accommodations, plaintiff could not perform the essential functions of his prior job as a journeyman lineman.  The case therefore boils down to whether defendant violated the ADA by failing to offer him a different position for which he was qualified at or about the time that doctors released him to return to work.  The Court considers defendant's motion for summary judgment in light of this procedural posture of the case—which unfolded with the briefing of defendant's motion for summary judgment.

## Analysis

Defendant asserts that it is entitled to summary judgment on all claims because plaintiff was not a "qualified individual" with a disability under the ADA, 42 U.S.C. § 12111 et seq.  As a

matter of law, as to plaintiff's retaliation claim, this argument clearly lacks merit.  Plaintiff need not be a "qualified individual" to bring a retaliation claim.  The Tenth Circuit has held that to bring an ADA retaliation claim, plaintiff need not show that he suffers from a disability.  Selenke v. Medical Imaging of Colorado, 248 F.3d 1249, 1264 (10th Cir. 2001).  "Unlike a plaintiff in an ADA discrimination case, a plaintiff in an ADA retaliation case need not establish that he is a 'qualified individual with a disability.'  By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA."  Id. (quoting Krouse v American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997)).  Accordingly, the Court addresses defendant's first argument only with respect to plaintiff's claim of disability discrimination and failure to accommodate.

As to plaintiff's specific theories of relief, defendant asserts it is entitled to summary judgment on plaintiff's accommodation claim because as a matter of law, it had no duty to accommodate plaintiff before the meeting on February 12, 2019 because plaintiff did not request an accommodation and he received temporary total disability benefits until January 17, 2019. Defendant asserts that it is entitled to summary judgment on plaintiff's discrimination claim because as a matter of law, plaintiff was not qualified to perform the essential functions of any available position.  Defendant asserts it is entitled to summary judgment on plaintiff's retaliation claim because (1) plaintiff did not engage in protected opposition to discrimination prior to his termination and (2) even if he did, defendant terminated his employment for a legitimate, non-discriminatory reason.  Finally, defendant asserts that plaintiff's rejection of a substantially equivalent offer precludes him from receiving back pay after January 31, 2020, the date when defendant offered him the staking technician position.

The Court first addresses plaintiff's accommodation claim because whether plaintiff was a

"qualified individual" under the ADA turns on whether plaintiff requested reassignment before October 22, 2018, when defendant posted the consumer services representative position.

## I.   Failure to Accommodate

Plaintiff argues that defendant violated the ADA, 42 U.S.C. § 12112(b)(5)(A), by failing to accommodate him by offering a different position.[14]  Defendant claims that as a matter of law, it had no duty to accommodate plaintiff before the meeting on February 12, 2019 because plaintiff had not requested an accommodation and he received temporary total disability benefits (and therefore unable to work) until January 17, 2019.

### A.   Request for Accommodation

Defendant seeks summary judgment on the ground that as a matter of law, it had no duty to accommodate plaintiff before the meeting on February 12, 2019 because plaintiff had not requested an accommodation.  Plaintiff responds that by expressing his desire to return to work either as a journeyman lineman or in a new position, he adequately requested an accommodation.

Under the ADA, to trigger an employer's duty to provide reasonable accommodations or participate in the interactive process, an employee must make an adequate request, thereby putting the employer on notice that the employee needs an accommodation.  E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011).  By direct communication or other appropriate means, the employee must make clear that he wants assistance for his or her disability.  Colwell v. Rite Aid Corp., 602 F.3d 495, 506 (3d Cir. 2010).  That is, the employer must know of both the

---

[14]      Plaintiff also argues that defendant violated the ADA, 42 U.S.C. § 12112(b)(5)(A), by failing to engage in the interactive process.  Failure to engage in the interactive process is not an independent cause of action, however, under the ADA.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1207 n. 29 (10th Cir. 2018).

disability and the employee's desire for accommodations for that disability.  C.R. England, Inc., 644 F.3d at 1049 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)).

Plaintiff cites evidence that multiple employees were aware of his injury, his recovery process and his desire to return to work in some capacity.  Such evidence creates a genuine issue of material fact whether plaintiff adequately requested accommodation.  A reasonable jury could find that plaintiff's statements (personally and through his wife, worker's compensation attorney and worker's compensation case manager) were sufficient to give defendant notice that plaintiff needed and wanted an accommodation for his disability.  Smith v. Midland Brake, Inc., 180 F.3d 1154, 1172 (10th Cir. 1999) (quoting Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 694 (7th Cir. 1998) ("A request as straightforward as asking for continued employment is a sufficient request for accommodation.").  Thus, defendant is not entitled to summary judgment on the ground that prior to February 12, 2019, plaintiff did not request an accommodation.

B.      Accommodation by Reassignment

Defendant argues that as a matter of law, it did not have a duty to accommodate plaintiff before January 17, 2019, when he stopped receiving temporary total disability benefits, or before February 1, 2019, when his doctor released him to return to work.  While this argument has theoretical appeal, it is not dispositive of plaintiff's claim because it ignores the law and the theory of plaintiff's case.

To survive summary judgment on an ADA claim for failure to accommodate by offering reassignment to a vacant position, an employee initially bears the burden of production with respect to a prima facie case.  Smith v. Midland Brake, Inc., 180 F.3d 1154, 1179 (10th Cir. 1999). Plaintiff must make an initial showing that (1) he is a disabled person under the ADA and has made any limitations from his disability known to his employer; (2) the preferred option of

accommodation within the employee's existing job cannot reasonably be accomplished; (3) the employee requested the employer to accommodate his disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may ask the employer to identify through an interactive process, in which the employee in good faith was willing to (or did) cooperate; (4) the employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and (5) the employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.  Id.

Once an employee establishes a prima facie case, the burden of production shifts to the employer to present evidence that conclusively (1) rebuts one or more elements of plaintiff's prima facie case or (2) establishes an affirmative defense.  Id.  If the employer establishes either, summary judgment will be appropriate for the employer.  Id.

Defendant argues that as a matter of law, it had no duty to offer plaintiff a new position while he was receiving temporary total disability benefits because to receive such benefits, plaintiff had to be completely and temporarily incapable of any type of substantial and gainful employment, § 44-510c(b)(2).[15]  Further, it argues that legally, it could not require plaintiff to return to work while receiving such benefits.

---

[15]     Under § 44-510c(b)(2), "[t]emporary total disability exists when the employee, on account of the injury, has been rendered completely and temporarily incapable of engaging in any type of substantial and gainful employment."  From September 17, 2015 through January 17, 2019, plaintiff received temporary total disability payments.

As to the first element of plaintiff's prima facie case, plaintiff cites evidence that he informed defendant about his limitations.  As to the second element, the parties agree that plaintiff's preferred option of accommodation within his previous position as a journeyman lineman could not reasonably be accomplished because defendant's safety guidelines and OSHA required that he wear Class 2 rubber gloves without conductive material inside and be able to perform pole-top rescues.  As to the third element, plaintiff cites evidence that he personally requested reassignment by speaking to Riley, Coleman, Klaus, Shelley, Kirk and McVay about his desire to return to work in various capacities.  Further, plaintiff cites evidence that his worker's compensation attorney and worker's compensation case manager, on his behalf, requested reassignment.  Midland Brake, Inc., 180 F.3d at 1172 (employee need not use magic words in expressing desire for reassignment).  As to the fourth element, plaintiff cites evidence that he reached maximum medical improvement in October of 2018, which is "at or about" October 22, 2018, the day that defendant posted a position for a consumer services representative, and October 24, 2018, the day that defendant received plaintiff's FCE results.  Plaintiff argues that defendant should have engaged in the interactive process and offered plaintiff the consumer services representative position because defendant knew that he could not perform his old position as a journeyman lineman, and that he wished to keep working.  Finally, as to the fifth element, plaintiff cites evidence that he suffered injury because defendant terminated his employment instead of reassigning plaintiff to the appropriate vacant position.

The record establishes genuine issues of material fact whether plaintiff sufficiently invoked the interactive process, whether defendant was on notice of his desire for reassignment and whether defendant adequately responded to his request for accommodation.  Defendant is not entitled to

summary judgment on plaintiff's accommodation claim on the theory that it had no duty to accommodate plaintiff before January 17 or February 1, 2019.

## II.     Disability Discrimination

Plaintiff alleges that defendant discriminated against him in violation of the ADA, 42 U.S.C. § 12112(a), by terminating his employment because of his disability.  Defendant argues that plaintiff cannot establish a prima facie case of disability discrimination because at the time defendant terminated his employment, he could not perform the essential functions of his job or any other available position and therefore he was not a "qualified individual" under the ADA. Plaintiff responds that he was qualified for at least one job which he desired and was available— the position of consumer services representative.

The ADA prohibits discrimination "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  To determine whether plaintiff is a qualified individual who can bring a disability discrimination claim, courts employ a two-part analysis. Adair v. City of Muskogee, 823 F.3d 1297, 1307 (10th Cir. 2016).  First, the court must determine whether the plaintiff can perform the essential functions of a job the individual either holds or desires.  Id.  Second, if plaintiff cannot perform the essential functions of the job, the court must determine whether any reasonable accommodation by the employer would enable him to perform those functions.  Id.

Defendant argues that plaintiff was not a "qualified individual" under the ADA because it could not modify or restructure his existing position to allow him to do his job and—more relevant to the current posture of the case—he could not perform the essential functions of any other available position.  Defendant argues that when it terminated plaintiff's employment, it had only three vacant positions—Social Media Specialist, Member Services and Key Accounts Manager

I—and that due to lack of education, plaintiff was not qualified for any of these positions.  Plaintiff does not disagree but argues that he was qualified to perform the consumer services representative position that defendant advertised on October 22, 2018.

Defendant asserts that plaintiff was not qualified for the consumer services representative position, citing McVay's declaration that the position required "fine finger dexterity" and experience that plaintiff did not possess.  Plaintiff's responds with evidence that he met the job requirements of the position, thus raising a genuine issue of material fact whether he was qualified to perform its essential functions.

Defendant argues that it did not have a duty to reassign plaintiff before plaintiff's physician released him for work on February 1, 2019.  An employer's duty to identify vacant positions arises when the employee requests reassignment, however, and ends after the employer determines that no positions are available or will become available in the fairly immediate future.  Albert v. Smith's Food & Drug Centers, Inc., 356 F.3d 1242, 1252 (10th Cir. 2004).  As stated above, the record reveals a genuine issue of material fact about when defendant was on notice of plaintiff's desire for reassignment, and what it understood his request to be.  Defendant posted the consumer services representative position the day before plaintiff's FCE.  Defendant knew that plaintiff's FCE was set for October 23, 2018 and that plaintiff wanted to return to work in some capacity in the very near future.  On October 24, 2018, defendant received the FCE results and knew that plaintiff could not perform his old position.  Defendant apparently did not consider plaintiff for the position or evaluate whether he could perform it, but on December 6, 2018, filled the position with another individual.  On this record, a reasonable jury could find that defendant's duty to identify vacant positions arose no later than October of 2018, continued through the time that defendant filled the consumer services representative position with another individual on

December 6, 2018, and did not end until February 12, 2019 (at the earliest). Plaintiff therefore establishes a genuine issue of material fact whether he is a "qualified individual" under the ADA.

## III.    Retaliation

Defendant seeks summary judgment on the ground that (1) plaintiff cannot establish a prima facie case of retaliation under the ADA because he did not engage in protected opposition to discrimination and (2) even if he could establish a prima facie case, defendant terminated his employment for legitimate, non-discriminatory reasons. Plaintiff responds that defendant's "continuous discussions about ending plaintiff's employment, particularly when made around his requested accommodations, create a genuine issue of material fact whether the requests caused his termination." Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #79) at 27.

To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination, (2) a reasonable person would have found the challenged action materially adverse and (3) a causal connection links the protected activity and the materially adverse action. Hennagir v. Utah Dept. of Corr., 587 F.3d 1255, 1265 (10th Cir. 2009). If plaintiff sets forth a prima facie case, the burden shifts to defendant to provide a legitimate, nondiscriminatory reason for the action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If defendant successfully does so, the burden shifts back to plaintiff to show that defendant's stated reason is a pretext for discriminatory intent. Id. at 804.

### A.    Protected Activity

To show that the act of requesting an accommodation constitutes "protected activity," plaintiff must show (1) a request for accommodation that is sufficiently direct and specific, giving notice that the employee needs a special accommodation, and (2) that at the time, plaintiff had a

reasonable, good faith belief that he was entitled to an accommodation.  Foster v. Mountain Coal Co., LLC, 830 F.3d 1178, 1187 (10th Cir. 2016); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 23 (1st Cir. 2004).  The notice or request does not have to be in writing or formally state "reasonable accommodation," but nonetheless must make clear that the employee wants assistance for his or her disability.  Foster, 830 F.3d at 1188.

Defendant argues that as a matter of law, plaintiff did not engage in protected opposition to discrimination prior to his termination.  For reasons stated above, however, a reasonable jury could find that plaintiff personally, and through his representatives, gave defendant sufficient notice that he needed and wanted accommodations for his disability.  Smith v. Midland Brake, Inc., 180 F.3d 1154, 1172 (10th Cir. 1999) (quoting Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 694 (7th Cir. 1998) ("A request as straightforward as asking for continued employment is a sufficient request for accommodation.").  Defendant is not entitled to summary judgment on the ground that plaintiff did not engage in protected activity.

B.    Pretext

Defendant argues that even if plaintiff could show that he engaged in protected activity, it had a legitimate, non-discriminatory reason for terminating his employment: he could not perform the essential functions of his position and no alternative positions were available.  Once defendant proffers legitimate, non-retaliatory reasons for its actions, the burden shifts back to plaintiff to show that defendant's reasons are merely pretexts for retaliation.  Foster, 830 F.3d at 1186.  At this final step of the McDonnell Douglas framework, the presumption of retaliation created by plaintiff's prima facie case "simply drops out of the picture."  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)).  Plaintiff may show pretext by demonstrating "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted . . . reasons." Id. (quotation omitted).

Plaintiff's opposition memorandum does not address pretext. As stated above, however, the record establishes genuine issues of material fact whether defendant was on notice of plaintiff's desire for reassignment and whether defendant adequately responded to any such request. A reasonable factfinder could rationally find that defendant posted the consumer services representative position at or about the time that plaintiff requested reassignment, and did not consider plaintiff for the position. Such evidence calls into question defendant's stated reason for terminating plaintiff's employment, i.e. that no alternative positions were available. Accordingly, defendant is not entitled to summary judgment on plaintiff's retaliation claim.

## IV.   Back Pay

Defendant seeks partial summary judgment on damages, on the ground that plaintiff's rejection of the staking technician position precludes him from receiving back pay after January 31, 2020, the date when defendant offered him that position. Plaintiff responds that his rejection was reasonable because the offer was conditional and not substantially equivalent to his prior position, and because his life circumstances made it impossible to accept the position.

Absent special circumstances, plaintiff forfeits his right to back pay "if he refuses a job substantially equivalent to the one he was denied." Giandonato v. Sybron Corp., 804 F.2d 120, 124 (10th Cir. 1986) (quoting Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 232 (1982)). The failure to accept an offer of reinstatement, however, does not automatically terminate an employee's right to relief. Giandonato, 804 F.2d at 124. In determining whether the right to relief extends beyond

the date of an offer of reinstatement, the trial court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and whether plaintiff had valid reasons for refusing the offer.  Id.

Defendant argues that the staking technician position was substantially equal to a journeyman lineman position because the pay was only slightly lower, the benefits were the same and the position held the same prestige.  Plaintiff cites evidence that the salary was not substantially equivalent to the journeyman lineman position and that he had valid reasons for refusing the offer.  Plaintiff has established a genuine issue of material fact whether the position was substantially equivalent to the journeyman lineman position and whether he had valid reasons for refusing the position.  In Defendant's Reply To Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. #82) filed September 8, 2021 at 19, defendant "concedes there are fact questions on this issue."  Accordingly, defendant is not entitled to summary judgment on the issue of back pay.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #74) filed August 4, 2021 is **OVERRULED**.

Dated this 6th day of December, 2021 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge